IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CARPENTERS PENSION TRUST FUND FOR NORTHERN CALIFORNIA, et al. | ) ) | Case No. 10-3386 SC |
| Plaintiffs, | ) ) ) | ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| v. | ) ) | |
| MARK ALAN LINDQUIST, | ) ) | |
| Defendant. | ) ) ) ) | |

## I.   INTRODUCTION

Before the Court is a Motion for Summary Judgment, brought by Plaintiffs Board of Trustees of the Carpenters Pension Trust Fund for Northern California, et al. ("the Pension Fund" or "Plaintiffs"), against Defendant Mark Alan Lindquist ("Lindquist" or "Defendant").  ECF No. 28 ("Mot.").  The Motion is fully briefed.  ECF Nos. 40 ("Opp'n"), 42 ("Reply").  Having considered the papers submitted, the Court concludes that entry of Summary Judgment against Defendant is appropriate, and GRANTS Summary Judgment in favor of Plaintiffs.

## II.   BACKGROUND

This action arises from Plaintiffs' efforts to recover

For the Northern District of California

withdrawal liability owed by M.A. Lindquist Co., Inc. ("the Company") under the Employee Retirement Income Security Act ("ERISA").[1]  On February 8, 2011, this Court entered judgment against the Company in favor of the Pension Fund in a related proceeding.  See Carpenters Pension Trust Fund for N. Calif. v. M.A. Lindquist Co., Inc., No. 10-812, 2011 U.S. Dist. LEXIS 12261 (N.D. Cal. Feb. 8, 2011).  Lindquist was the Company's sole shareholder.  McDonough Decl. Ex. B ("Lindquist Dep.") at 10:7-24.[2]  The Pension Fund now seeks to recover the Company's withdrawal liability from Lindquist directly.

**A.   The Company's Withdrawal from the Pension Fund**

The following facts are undisputed.  During the time period at issue in this lawsuit, Defendant owned one hundred percent of the outstanding shares of the Company.  Id.  The Company was a participating employer in the Pension Fund.  ECF No. 9 ("Answer") ¶ 10; Price Decl. ¶ 5.[3]  As such, the Company was obligated to make contributions to fund benefits for employees under the Pension Fund pursuant to a collective bargaining agreement with the Carpenters 46 Northern California Counties

---

[1] As explained more fully below, ERISA requires an employer that withdraws from a multiemployer pension plan to compensate the pension plan for benefits that have already vested with the employees at the time of the employer's withdrawal.  This "withdrawal liability" is assessed against the employer to ensure that employees are not deprived of anticipated retirement benefits by virtue of their employer's withdrawal from the pension plan before the plan has amassed sufficient funds to cover the benefits owed to employees.

[2] Katherine McDonough ("McDonough"), attorney for Plaintiffs, filed a declaration in support of the Motion.  ECF No. 28-2.

[3] Gene Price ("Price"), Administrator of the Carpenters Pension Trust Fund, filed a declaration in support of the Motion.  ECF No. 28-1.

For the Northern District of California

Conference Board of the United Brotherhood of Carpenters and Joiners of America, the Agreement and Declaration of Trust of the Pension Fund, and Section 515 of the ERISA, 29 U.S.C. § 1145. Id.

On or about April 1, 2006, the Company withdrew from the Pension Fund. Answer ¶ 12; Price Decl. ¶ 5. On or about August 1, 2006, the Pension Fund sent the Company a Notice of Withdrawal Liability informing the Company that it owed the Pension Fund $954,508 and attaching the actuarial calculations in support of this figure. Price Decl. Ex. A ("Aug. 1, 2006 Notice"). Plaintiffs received no payment and sent the Company a follow-up letter on August 10, 2006. Id. Ex. B ("Aug. 10, 2006 Letter"). On October 5, Plaintiffs sent the Company a letter informing it that if an installment payment of $11,816 was not received within sixty days, the Pension Fund would require immediate payment of the entire withdrawal liability amount. Id. Ex. C ("Oct. 5, 2006 Letter"). The letter was returned as undeliverable. Id. On November 13, 2006, Plaintiffs' agent hand delivered the August 1, 2006 Notice and the October 5, 2006 Letter to the Company. Price Decl. ¶ 12. Lindquist admits that the Company received the withdrawal liability demand. McDonough Decl. Ex. B ("Def.'s Resp. to Pls.' RFA") at 2. To date, Plaintiffs have not received a withdrawal liability payment from the Company or from Lindquist. Price Decl. ¶ 13.

The Company did not submit a request for review of its withdrawal liability to the Pension Fund or initiate arbitration proceedings regarding the assessment of its withdrawal liability. Price Decl. ¶¶ 14-15; Def.'s Resp. to Pls.' RFA at

For the Northern District of California

2-3.

On February 26, 2010, the Pension Fund filed suit against the Company ("the 10-812 action") under ERISA seeking to recover the payments owed.  See Complaint, Carpenters Pension Trust Fund, No. 10-812 (N.D. Cal. Feb. 26, 2010), ECF No. 1.  On August 2, 2010, the Pension Fund filed this parallel action against Lindquist in his personal capacity.  ECF No. 1 ("Compl.").  On February 8, 2011, the Court granted summary judgment against the Company in the 10-812 action.  2011 U.S. Dist. LEXIS 12261, at *11.

**B.   Lindquist's Real Estate Leasing Activities**

In or around 1999, Lindquist and his wife purchased a commercial property located at 1701 Martin Luther King Jr. Way in Oakland, California ("the 1701 Property").  Lindquist Dep. at 11:4-45.  They began leasing the 1701 Property to the Company in 1999 for $2,000 per month.  Id. at 12:4-18.  The Company used the 1701 Property for office space for superintendents and foremen, for equipment storage, and as a cabinet shop.  Id. at 12:19-24.  According to Lindquist, the Company's lease of the 1701 Property terminated on March 31, 2006, the day before the Company withdrew from the Pension Fund.  Lindquist Decl. at ¶ 13.[4]  Beginning in January 2007 and continuing until the present, Lindquist has leased the 1701 Property to a construction management firm, 1701 Associates, Inc., owned by Lindquist and his daughter.  Lindquist Dep. at 24.

In 2005, Lindquist and his wife purchased a ski condominium

---

[4] Lindquist filed a declaration in support of his Opposition. ECF No. 41.

For the Northern District of California

("the condominium") from the Company.  Id. at 22-23.  They

rented out the condominium from approximately December 2005

through March 2006.  Id.  They sold the condominium in May 2006.

Id. at 23.

Plaintiffs now seek summary judgment against Lindquist in

his personal capacity based on his real estate leasing

activities.  They argue that Lindquist's leasing activities,

especially his leasing of the 1701 Property to the Company,

constitute a "trade or business" under common control with the

Company, and that Lindquist is therefore liable for the

Company's withdrawal liability under ERISA's common control

provisions.  Mot. at 7-8.  Lindquist argues that summary

judgment should be denied because material issues of fact exist

as to whether his real estate activities amounted to a "trade or

business" as of the date of the Company's withdrawal from the

Pension Fund on April 1, 2006.  Opp'n at 1-8.  Lindquist

contends that the 1701 Property and the condominium were merely

"passive investments" at that time.  Id.

**III.  LEGAL STANDARD**

    **A.  Summary Judgment**

Entry of summary judgment is proper "if the pleadings, the

discovery and disclosure materials on file, and any affidavits

show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(c).  Summary judgment should be granted if

the evidence would require a directed verdict for the moving

party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251

For the Northern District of California

1  (1986).  Thus, "Rule 56(c) mandates the entry of summary

2  judgment . . . against a party who fails to make a showing

3  sufficient to establish the existence of an element essential to

4  that party's case, and on which that party will bear the burden

5  of proof at trial."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322

6  (1986).  "The evidence of the non-movant is to be believed, and

7  all justifiable inferences are to be drawn in his favor."

8  <u>Anderson</u>, 477 U.S. at 255.

9

10 **IV.   DISCUSSION**

11      **A.   "Withdrawal Liability" Under ERISA**

12      Pension plans are federally regulated pursuant to ERISA, 29

13 U.S.C. § 1001 <u>et seq</u>.  The Multiemployer Pension Plan Amendments

14 Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381-1453, amended ERISA to

15 allow plans to impose proportional liability on withdrawing

16 employers for the unfunded vested benefit obligations of

17 multiemployer plans.  <u>Carpenters Pension Trust Fund v.</u>

18 <u>Underground Constr. Co., Inc.</u>, 31 F.3d 776, 778 (9th Cir. 1994).

19 The MPPAA sought to ensure that if a withdrawing employer's past

20 contributions did not fully fund the obligations that had vested

21 at the time of its withdrawal, then the withdrawing employer

22 would have to pay its proportionate share of the deficit.  <u>Id.</u>

23      This system is designed to make employers pay their share

24 of the real cost of pensions by paying a share of the difference

25 between the assets already contributed and the vested benefit

26 liability.  <u>Woodward Sand Co., Inc. v. W. Conf. Teamsters</u>

27 <u>Pension Trust Fund</u>, 789 F.2d 691, 694 (9th Cir. 1986).  When an

28 employer withdraws from a multiemployer pension plan, ERISA

6

For the Northern District of California

requires the withdrawing employer to compensate the pension plan for benefits that have already vested with the employees at the time of the employer's withdrawal.  Id.  This "withdrawal liability" is assessed against the employer to ensure that employees and their beneficiaries are not deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans.  Id.

Under 29 U.S.C. § 1399, the amount of a withdrawing employer's withdrawal liability is first computed by the pension plan's sponsor.  The employer is then notified of the amount owed and is entitled, within ninety days of such notice, to ask the sponsor to review any specific matter relating to the determination of the employer's withdrawal liability.  29 U.S.C. § 1399(c).  "Any dispute" between an employer and the plan sponsor relating to the employer's withdrawal liability "shall be resolved through arbitration."  29 U.S.C. § 1401(a)(1).

Arbitration may be initiated "within a 60-day period" after the employer is notified of the sponsor's final determination concerning withdrawal liability (or 120 days after the employer requested the sponsor to review the matter, whichever date is earlier).  29 U.S.C. § 1401(a)(1).  If arbitration proceedings are not initiated within the time periods prescribed by the statute, "the amounts demanded by the plan sponsor . . . shall be due and owing on the schedule set forth by the plan sponsor."  29 U.S.C. § 1401(b)(1).  If the employer fails to make payment when due, and fails to cure the delinquency within sixty days of notice of the delinquency, the plan sponsor is entitled to

For the Northern District of California

1  obtain immediate payment of the entire amount of the employer's

2  outstanding withdrawal liability.  29 U.S.C. § 1399(c)(5).

3      The MPPAA defines "employer" to include not only the entity

4  making contributions to the pension plan, but also "trades or

5  businesses (whether or not incorporated)" that are under "common

6  control" with the contributing entity.  29 U.S.C. § 1301(b)(1).[5]

7  Under § 1301(b)(1), trades or businesses under common control

8  are therefore considered a single employer under ERISA and are

9  jointly and severally liable for each other's withdrawal

10 liability.  Bd. of Trustees W. Conf. of Teamsters v. Lafrenz,

11 837 F.2d 892, 893 (9th Cir. 1988).

12      Under the above framework, in order to impose the Company's

13 withdrawal liability on Lindquist as sole proprietor of a real

14 estate operation, two conditions must be satisfied: (1) the real

15 estate operation must be under common control with the Company;

16 and (2) it must qualify as a "trade or business" under §

17 1301(b)(1).

18      Plaintiffs argue that summary judgment is appropriate

19 because the undisputed evidence establishes both of the elements

20 above.  Mot. at 1.  Lindquist does not dispute that the "common

21 control" element needed for joint and several liability is

22 satisfied, as Lindquist was the sole shareholder of the Company

23 and the owner of the real estate operation.  See Opp'n.

24 Therefore, the only question at issue is whether Lindquist's

25 leasing operation constituted a "trade or business" for the

26 ────────────────────
   [5] Congress enacted § 1301(b)(1) in order "to prevent businesses
27 from shirking their ERISA obligations by fractionalizing
   operations into many separate entities."  Teamsters Pension
   Trust Fund v. Allyn Transp. Co., 832 F.2d 502, 507 (9th Cir.
28 1987).

For the Northern District of California

1  purposes of § 1301(b)(1).

2      Plaintiffs argue that all courts that have considered the

3  issue, including the Ninth Circuit, have found summary judgment

4  in favor of the pension fund appropriate where, as here,

5  controlling shareholders in a withdrawing corporation own

6  property that they lease to the corporation.  Mot. at 18.  To

7  hold otherwise, according to Plaintiffs, would undermine the

8  purpose behind § 1301(b)(1) by allowing business owners to

9  escape withdraw liability by maintaining business assets in

10  their own name and leasing those assets to the company.[6]  Id.

11  Relying on Central States v. Fulkerson, 238 F.3d 891, 895-95

12  (7th Cir. 2001), Lindquist argues that his involvement with the

13  lease of the 1701 Property was so minimal as to render the lease

14  a "passive investment" rather than a trade or business.  Opp'n

15  at 4-7.

16      **B.   "Trade or Business" Under 29 U.S.C. § 1301(b)(1)**

17      ERISA does not contain a definition of the term "trade or

18  business."  Lafrenz, 837 F.2d at 894 n.6.  Section 1301(b)(1)

19  provides that the phrase "trades or businesses (whether or not

20  incorporated) which are under common control" has the same

21  meaning as that provided in the regulations promulgated under

22  section 414(c) of the Internal Revenue Code.  However, "trade or

23  business" is not clearly defined in either section 414(c) or the

---

24

25  [6] Plaintiffs also argue briefly that Lindquist's leasing of the
    ski condominium and the manner in which Lindquist claimed
26  deductions on his tax returns further support the conclusion
    that his leasing activities were a trade or business under
27  ERISA.  The Court does not address these arguments because it
    finds Lindquist's lease of the 1701 Property to the Company
28  sufficient to establish liability.

For the Northern District of California

1    regulations promulgated thereunder.  Id.  Whether activities

2    qualify as a "trade or business" is essentially a factual

3    inquiry.  Lafrenz, 837 F.2d at 894 n.6.[7]  To guide this factual

4    inquiry, courts look to Congress's purpose in enacting §

5    1301(b)(1): "to prevent the controlling group of a company from

6    avoiding withdrawal liability by shifting corporate assets into

7    other business ventures under its control."  Id. at 894.

8         The facts of Lafrenz closely parallel those of the instant

9    case.  In Lafrenz, a pension plan was unable to collect

10   withdrawal liability from a withdrawn corporation because the

11   corporation declared bankruptcy.  Id.  The pension plan

12   therefore sued Stanley and Anita Lafrenz, who owned ninety-six

13   percent of the corporation's outstanding shares and also owned

14   two dump trucks, which they leased to the corporation for

15   profit.  Id.  The district court held that the truck-leasing

16   operation was a "trade or business" under common control with

17   the corporation because the Lafrenzes owned both.  Id.  The

18   court granted summary judgment in favor of the pension fund,

19   holding the Lafrenzes personally liable for the withdrawal

20

21   _____

22   [7] Lindquist urges the Court to apply the definition of "trade or
     business" used by the Supreme Court when interpreting a
23   different provision of the Internal Revenue Code, and
     subsequently used by the Seventh Circuit in a withdrawal
24   liability case like this one.  See Comm'r of Internal Revenue v.
     Groetzinger, 480 U.S. 23, 35 (1987); Fulkerson, 238 F.3d at 895-
25   95.  For an activity to be a trade or business under the
     Groetzinger test, a person must engage in the activity: (1) for
26   the primary purpose of income or profit; and (2) with continuity
     and regularity.  480 U.S. at 35.  The second prong of the
27   Groetzinger test distinguishes between active and passive
     investments.  Fulkerson, 238 F.3d at 895-95.  However, the Ninth
28   Circuit has not adopted this approach, and the Court declines to
     do so here.  Lafrenz, 837 F.2d at 894.

For the Northern District of California

1  liability because they were sole proprietors of the truck

2  leasing operation.  Id.

3      On appeal, the Lafrenzes argued, as Lindquist does here,

4  that their truck-leasing operation should not be considered a

5  trade or business because it was a passive investment.  Id. at

6  894.  The Ninth Circuit rejected this argument, noting that the

7  statute does not distinguish between active and passive

8  investments.[8]  The Court cited with approval two district court

9  cases holding that a proprietorship which leased property to a

10 commonly controlled corporation was a trade or business under §

11 1301(b)(1).  Id. at 895 (citing United Food v. Progressive

12 Supermarkets, 644 F. Supp. 633, 638 (D.N.J. 1986), and Pension

13 Benefit Guar. Corp. v. Ctr. City Motors, 609 F. Supp. 409, 412

14 (S.D. Cal. 1984)).  The Court stated: "[t]he Lafrenzes own the

15 trucks, arranged for the truck leases and admittedly leased the

16 trucks for profit.  That is plainly sufficient to make the

17 truck-leasing operation a 'trade or business' under the sweeping

18 language of the statute."  837 F.2d at 894.

19     Here, the undisputed evidence shows that Lindquist leased

20 the 1701 Property to the Company for nearly seven years and

21 received $2,000 per month in revenue from the leasing

22 arrangement.  Lindquist Dep. at 11:2-25, 12:1-5.  There is

23 simply no significant basis for distinguishing this case from

24 Lafrenz or a multitude of other cases that have uniformly found

25

26 [8] In a footnote the court acknowledged that some type of "passive
   investments" might exist that would not qualify as a trade or
27 business: "[w]e do not hold that every 'passive investment' is
   necessarily a trade or business. We hold only that the facts in
28 this case justify the conclusion that the truck-leasing
   operation is a trade or business."  Id. at 895 n.7.

For the Northern District of California

property leases between two commonly controlled entities to constitute a trade or business under § 1301(b)(1).  See, e.g., Ctr. City Motors, 609 F. Supp. at 412 ("[T]he court finds that Congress did not intend to exclude from its definition of a 'trade or business' in § 1301, a rental proprietorship which leases property, under a net lease, to an entity that is under common control."); Cent. States S.E. & S.W. Areas Pension Fund v. Ditello, 974 F.2d 887, 890 (7th Cir. 1992) ("Federal courts reaching this issue, including this circuit, have uniformly held that leasing property to a withdrawing employer is a 'trade or business' for purposes of section 1301(b)(1)."); Vaughn v. Sexton, 975 F.2d 498, 503 (8th Cir. 1992) (family trust that leased real property to withdrawing entity was a trade or business under ERISA).  Lindquist provides no authority to the contrary.[9]  Indeed, to hold otherwise would thwart the purpose of § 1301(b)(1) by allowing controlling shareholders to evade withdrawal liability by maintaining property under separate ownership and leasing it to the company.

Lindquist seeks to distinguish Lafrenz on the ground that the extent of his leasing activity "was so minimal as to make

---

[9] Lindquist's reliance on Fulkerson is misplaced.  In Fulkerson, the Seventh Circuit applied the Groetzinger test for "trade or business" and found that the defendants' leasing activities were too passive to qualify as a trade or business under § 1301(b)(1).  238 F.3d at 895.  The court explained that the defendants' mere holding of real property leases -- without taking actions such as negotiating the leases, researching properties, or maintaining the properties -- constituted a passive investment akin to owning stocks or commodities.  Id. As noted above, the Ninth Circuit has not adopted the Groetzinger test.  Moreover, unlike in this case, the defendants in Fulkerson did not lease property to the withdrawing employer. Id. at 893.

For the Northern District of California

1  the investment passive."  Opp'n at 5-6.  He points to a footnote
2  in Lafrenz acknowledging that some passive investments may not
3  be considered a trade or business.  Id.  In support of his
4  argument, Lindquist declares that he "spent less than 5 hours
5  per year related to the 1701 investment" and that the Company
6  "took care of all operations at the property."  Lindquist Decl.
7  ¶ 12.  He further declares that the lease of the 1701 Property
8  to the Company terminated the day before the Company withdrew
9  from the pension plan.  Id. ¶ 13.

10      Even assuming the truth of these assertions, Lindquist has
11  provided no significant basis for distinguishing his case from
12  Lafrenz or the multiplicity of other district and appellate
13  cases that have found leasing property to a withdrawing employer
14  to be a trade or business under ERISA.  First, the fact that the
15  Company, rather than Lindquist personally, took care of the 1701
16  Property is immaterial.  As stated in Center City and reiterated
17  in United Food, "the fact that one of the entities bore nearly
18  all the responsibilities under the lease [does] not insulate the
19  other from being treated as a 'trade or business' for purposes
20  of § 1301(b)(1)."  United Food, 644 F. Supp. at 639 (quoting
21  Ctr. City, 609 F. Supp at 612).

22      Second, the fact that the lease terminated the day before
23  the Company's withdrawal similarly does not alter the Court's
24  analysis.  In United Food, the withdrawing entity's lease
25  terminated more than four months before its withdrawal from the
26  pension fund, but the court did not find this to be a
27  significant factor in determining whether the defendant's
28  leasing activities were a trade or business under ERISA.  644 F.

13

For the Northern District of California

Supp. at 639; see also Cent. States S.E. and S.W. Areas Pension Fund v. Pers., Inc., 974 F.2d 789 (7th Cir. 1992) (leasing property to employer qualified as trade or business even though lease expired almost two years before withdrawal).  The Court finds the same here.  Lindquist does not explain why the date of the lease's termination should be relevant to the "trade or business" inquiry.  He cites to out-of-circuit authority stating that the common control element of the analysis must be determined as of the date of withdrawal.  See Opp'n at 2 (citing IUE AFL-CIO Pension Fund v. Barker & Williamson, 788 F.2d 118, 125 (3rd Cir. 1986)).  Barker is inapposite, as there is no dispute that Lindquist owned both the company and the real estate operation on the date of withdrawal.  Moreover, under the rule proposed by Lindquist, employers could avoid group liability by simply terminating their leases the day before withdrawing from the pension fund.  This would undermine the purpose of the statutory scheme.

Last, the fact that Lindquist spent fewer than five hours per year "related to the 1701 investment" is also irrelevant. It is unclear what Lindquist means by this statement.  He presumably provides this information because the Fulkerson court held that a lease in that case was a passive investment in part because the lessor "averred that he never spent more than five hours in a year dealing with the lease or the leased properties."  238 F.3d at 896.  However, as noted above, Fulkerson is inapposite because the defendant in that case, unlike here, did not lease property to the withdrawing employer. Lindquist concedes that the Company, of which he was the sole

For the Northern District of California

1    shareholder, made extensive use of the 1701 Property, using it

2    as office space, storage space, and a cabinet shop.  Lindquist

3    Dep. at 11-12.  The amount of time spent by Lindquist himself on

4    activities related to the property does not transform his

5    leasing operation from a trade or business into a passive

6    investment.

7        In short, while Lafrenz does indicate that there are some

8    types of investments that might be too "passive" to qualify as a

9    trade or business under ERISA, leasing property to a withdrawing

10   entity is certainly not one of them.  Unlike the purchase of

11   stocks or bonds in publicly traded companies, which, for

12   example, might properly be considered passive investments beyond

13   the scope of § 1301(b)(1), Lindquist's leasing operation poses

14   precisely the type of fractionalization threat that § 1301(b)(1)

15   was designed to address.

16       Accordingly, the Court GRANTS summary judgment in favor of

17   Plaintiffs.

18       **C.   Remedy**

19       ERISA provides that "[i]n any action under this section to

20   compel an employer to pay withdrawal liability, any failure of

21   the employer to make any withdrawal liability payment within the

22   time prescribed shall be treated in the same manner as a

23   delinquent contribution . . . ."  29 U.S.C. § 1451(b).  In an

24   action to enforce payment of delinquent contributions, a

25   plaintiff is entitled to recover the unpaid contributions,

26   interest, liquidated damages, and reasonable attorneys' fees and

27   costs.  29 U.S.C. § 1132(g)(2).  See also Operating Eng'rs

28   Pension Trust Fund v. Clarke's Welding, Inc., 688 F. Supp. 2d

For the Northern District of California

902, 914 (N.D. Cal. 2010).

### 1.   Liquidated Damages

ERISA section 502(g)(2)(C) authorizes a liquidated damages award pursuant to the terms of the pension plan in an amount not in excess of twenty percent of the total withdrawal liability. 29 U.S.C. § 1132(g)(2)(C)(ii).  Here, the pension plan provided that "the amount of damage to the Fund and the Pension Plan resulting from any failure to promptly pay shall be presumed to be the sum of $20.00 per delinquency or 10% of the amount of the Contribution or Contributions due, whichever is greater."  Price Decl. ¶ 16; Aug. 1, 2006 Letter.  Accordingly, Plaintiffs seek liquidated damages equal to ten percent of the total withdrawal liability amount of $954,508, amounting to a total of $95,450.80 in liquidated damages.

### 2.   Interest

ERISA Section 502(g)(2)(B) provides that interest on unpaid contributions shall be determined based on the rate provided under the plan, or, if none, the rate prescribed under section 6621 of the Internal Revenue Code.  29 U.S.C. § 1132(g)(2)(B). Here, the plan provides that interest on past due withdrawal liability shall be calculated using the California statutory rate of ten percent for unpaid judgments.  Price Decl. ¶ 17; Cal. Code Civ. Proc. § 685.010.  Plaintiffs have calculated the total interest owed from October 1, 2006 through the filing of this Motion on March 31, 2010 to be $429,397.85.  Price Decl. ¶ 17.  However, Plaintiffs have not explained why they used October 1, 2006 as the starting date for the interest calculation.  Plaintiffs shall file a supplemental declaration

16

1  with the Court explaining the basis for using October 1, 2006 as

2  the start date for interest accrual.

3          3.    Attorneys' Fees and Costs

4      ERISA section 502(g)(2)(D) entitles Plaintiffs to an award

5  of reasonable attorneys' fees and costs.  29 U.S.C. §

6  1132(g)(2)(D).  Plaintiffs have not provided a statement of

7  attorneys' fees and costs but assert that they will move for

8  fees and costs if judgment is awarded in their favor.  Mot. at

9  23.  Plaintiffs must do so within thirty days.

10

11  **V.    CONCLUSION**

12      The Court GRANTS the Motion for Summary Judgment filed by

13  Plaintiffs Carpenters Pension Trust Fund of Northern California

14  and Board of Trustees of the Carpenters Pension Trust Fund for

15  Northern California and against Defendant Mark Alan Lindquist,

16  in the amount of $954,508.00 in unpaid principal withdrawal

17  liability, $95,450.80 in liquidated damages, and applicable

18  interest in an amount to be determined.  Within thirty (30) days

19  of this Order, Plaintiffs shall: (1) file a declaration with the

20  Court explaining why the start date for interest accrual should

21  be October 1, 2006; and (2) file a motion for attorneys' fees

22  and costs.

23

24      IT IS SO ORDERED.

25

26  Dated: July 19, 2011

27                        UNITED STATES DISTRICT JUDGE

28